53 CCPA

**Robert S. KRAVIG and Arnold E. Johnson, Appellants,**

v.

**David J. HENDERSON, Appellee.**

**Patent Appeal No. 7862.**

United States Court of Customs and Patent Appeals.

July 14, 1966.

Rehearing Denied Aug. 6, 1966.

Stanley G. DeLa Hunt, Harold J. Kinney, St. Paul, Minn., John H. Lewis, Jr., Washington, D. C., for appellants.

John J. Hart, New York City, for appellee.

Before RICH, Acting Chief Judge, MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

MARTIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority as to all of the four counts remaining in interference No. 92,874 to David J. Henderson, the junior party.

The invention in issue relates to a machine for making decorative bows from a continuous length of ribbon. The machine includes a rotatable loop retaining means capable of retaining in fixed position relative thereto ribbon which is applied to it by a ribbon feed means which operates successively to apply spaced portions of the ribbon against the retaining means. The retaining means is caused to rotate between the successive applications thereto of ribbon portions so as to form a bow having loops radiating in different directions from the center. In Henderson's machine, the retaining means comprises a vertically disposed, rotatable spindle having permanently provided on its upper end a plurality of barbed needles on which the spaced ribbon portions are impaled and from which the formed loops of ribbon must be withdrawn when a bow is completed. In the Kravig machine, the retaining means is a horizontally disposed pin in the general shape of a collar button, which pin is releasably held in the machine during the bow forming operation and then removed as part of the completed bow. Both parties disclose the provision of a shaft for rotatably supporting a supply roll of ribbon.

In issue are counts 1, 2, 3 and 6 of which 1 and 3 are representative:

1. In a machine for making decorative bows from a continuous length of ribbon or strip material, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto and rotatively therewith ribbon applied thereagainst, said feed means operating successively to apply portions of ribbon spaced along the continuous length thereof against said retaining means successively to form radiating loops of ribbon.

3. A machine for making decorative bows from a continuous length of ribbon comprising a shaft for receiving and rotatably supporting a supply roll of ribbon, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto ribbon applied thereagainst; said feed means operating to withdraw a continuous length of ribbon from a supply roll mounted on said shaft and successively to apply portions of ribbon spaced along said continuous length against said retaining means successively to form radiating loops of ribbon, said retaining means being caused to rotate between each application of a ribbon portion thereto, said loops thereby being twisted as they are formed and being disposed on different radii.

Count 2 relates to the same combination as count 1. Count 6, like count 3, calls for a combination additionally including a supporting shaft for the supply roll of ribbon.

---

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

The counts correspond to claims 1, 2, 5 and 17 of patent No. 2,933,223 issued to the senior party Kravig and Johnson (Kravig) April 19, 1960 on application serial No. 750,396, filed July 23, 1958. Henderson is involved in the interference on the basis of application serial No. 98,043, filed March 24, 1961 as a division of application serial No. 78,900 filed December 28, 1960.

Since the effective filing date of Henderson is subsequent to the issue date of the Kravig patent, he has the burden of proving priority beyond a reasonable doubt. Conner v. Joris, 241 F.2d 944, 44 CCPA 772; Paivinen v. Sands, 339 F.2d 217, 52 CCPA 906.

Both parties took testimony.

The testimony for Henderson relates to activities in connection with bow making machines alleged to have started in about 1954 and extended past the filing date of his application in 1960. Kravig introduced testimony directed to the development of bow making machines starting around 1957. He also took testimony in rebuttal of certain testimony of Henderson.

The board based its award of priority on the conclusion that Henderson "established with the required weight of evidence" the introduction into the United States of his first machine, which it designated "the precursor to the modified device illustrated in Exh. 3A and 3B," and the actual reduction of practice thereof in the United States, "at least as early as the spring of 1956." It further held that the structure of that first model "embodies and clearly supports the language of each of the counts setting forth the invention * * *," commenting that the "senior party nowhere in the record controverts this view." In request for a reconsideration before the board and here, Kravig does question the latter conclusion particularly as to the shaft for receiving and rotatably supporting a supply roll of ribbon in counts 3 and 6. The principal issues hence are whether the board was correct in finding that Henderson proved beyond a reasonable doubt that he reduced to practice the precursor of the modified device illustrated in Exhibits 3A and 3B and, if so, whether that structure meets the limitations of the counts, particularly counts 3 and 6.

It is shown by the record that Henderson, a citizen of Canada residing in Montreal West, conducted two businesses involving ribbon and bow manufacturing during the period of interest here. One business, called Beacon Ribbon Mills, was located at Valleyfield in Canada and produced ribbon, bows, tapes, cords, etc. The other, in Plattsburgh, New York, was carried out originally under the name of Beacon Ribbon Mills but the name was changed in about 1958 to Aranac Ribbon Mills, Incorporated. The Plattsburgh plant manufactured bows exclusively or substantially so.

Henderson testified that he wanted to make bows automatically and in 1954 conceived of and made a hand-operated model or machine embodying his conception. While the machine was made in Canada, it was brought to the United States by Henderson when he opened his Plattsburgh plant in April of 1955. Henderson testified that the machine was demonstrated there by making bows, and it was modified at times in a manner described by him. The model, as subsequently modified, is purportedly illustrated in Exhibits 3A and 3B, which are recent photographs of an actual structure present during the taking of testimony, at final hearing before the board, and at oral argument before us.

The record shows further that a series of several more models of ribbon bow making machines were built and tested, but, as noted by the board, the record is extremely confusing as to details concerning them. It is clear though that three more models were made, sometimes by using parts of a preceding machine and even then modified, but those activities were performed in Canada and the models apparently were never brought into the United States. A fifth model, also made in Canada was brought into the United States in 1958.

Returning then to the first model, Henderson testified, with Exhibits 3A and 3B and the model shown therein before him, as to the structure and operation of the model in such detail as the board considered sufficient for one skilled in the art to understand and practice the invention embodied therein. Further, he described the modifications that had been made in considerable detail thus giving a picture of the structure as originally built and used.

Henderson testified that the first model was one of the first things he brought to the United States to his plant in Plattsburgh when he opened it around April of 1955 and that he showed that model to Robert Glenn who eventually became his plant manager there. He stated that he made a great many samples of bows there in 1955; not "any production but a great many samples; these samples were shown to my accounts." He testified that the model was first installed in his first quarters in Plattsburgh which he maintained from April to August of 1955 and that, while it was in that first plant, he demonstrated it to Glenn, making bows for him.

Henderson testified on cross-examination that the model satisfied him with the principle of operation for making a bow but stated he "did not consider this a useful commercial device." Among the modifications he attempted was the speeding up of the machine by adding a stapler for stapling the finished bow together.

Glenn testified that he became manager of Henderson's plant in Plattsburgh in the early summer of 1955 after first meeting Henderson in early spring of that year when Henderson was moving into his first Plattsburgh quarters adjacent a parking lot Glenn was then operating. Glenn had been plant manager in Plattsburgh for the Pal Safety Razor Blade Company which sold out in 1953 to American Razor Company which, in turn, ultimately moved out in 1954.

With respect to the model of Exhibits 3A and 3B, Glenn stated he saw it a month or so after he met Henderson in "early Fifty-five, not later than June, Nineteen fifty-five." He testified that Henderson explained how the model worked, demonstrated the use of it and made bows on it. While testifying primarily concerning production of hand tied bows at a later date, in 1957, as their first commercial production, Glenn testified that before that time:

* * * A. We did not make any for sale. We were experimenting, trying to make bows. During this time we could make bows such as this.

Q. With the equipment shown on Exhibit Three-A and Three-B? A. But not much faster than you could do it by hand. The idea was still there but not developed far enough to be used in mass production.

Glenn also testified at length concerning the machines made subsequently.

Another corroborating witness for Henderson was Thomas McGrath, employed by Plattsburgh Foundry and Machine Company and in charge of maintenance of equipment rented or loaned by that Company. He testified he first met Henderson in the spring of 1956 and fixed that date with reference to his supervising the removal from the building housing Henderson's plant of certain equipment his company had purchased from American Safety Razor Company. On being shown the photographs constituting Exhibits 3A and 3B and the model shown therein, McGrath stated that he saw the machine and saw it operate. He further stated:

* * * A. This machine here and this view, if you want to call this machine at the time I saw it, I called it a gadget, it was in the office the day I was down there packing up machinery. Mr. Glenn invited me over to their part of the Ribbon Mill which was separate from where we were working and he asked me if I wanted to see something. I went over and Mr. Henderson made a bow on this machine, which amazed me.

McGrath additionally stated that, while the operation of the machine was ex-

plained "not too thoroughly" to him, he did understand how it operated because "the machine was a simple operation the way he explained it and I had no trouble following him." On cross-examination, McGrath adhered to his former testimony that he saw the machine or "gadget" in the spring of 1956, stated that "it was a working device, a machine," and further gave a reasonably comprehensive description of the machine and its operation without reference to the exhibits.

The record also shows that McGrath subsequently became a part-time employee of the Plattsburgh plant and contributed to the attainment of a commercial operation with later machines.

The board acknowledged that there was confusion in portions of the Henderson record, "particularly relating to Henderson's activities in Canada and relating to the preparation and multilation of the numerous drawings and copies of drawings forming Exhs. 7, 7A, 17, 18, 23 and 35." It also expressed realization of "the frailties of the human mind in the recollection of events that occurred some eight to ten years before the testimony was taken." However, the board reasoned that, under the circumstances, with the Henderson testimony relating to specific changes made in the series of five different models ranging from the first hand operated device of Exhibits 3A and 3B to the complex automatic device ultimately developed for mass production purposes, some confusion was to be expected. In support of its conclusion the evidence proved that the precursor of Exhibits 3A and 3B was reduced to practice in the United States at least as early as the spring of 1956, the board stated:

> * * * We have referred in the foregoing to Henderson's testimony relating to the first model (illustrated in Exhs. 3A and 3B) and we note that there is no confusion on his part as to *that* structure or the changes therein. We believe that it would not be unreasonable to expect that he might be confused as to the subsequently developed models. We see no reason in

that confusion to doubt the credibility of his testimony as to that first model. Nor do we see wherein any cloud of suspicion is cast over Henderson's entire case, particularly the proven introduction into the United States of the "original" of the model shown in Exhs. 3A and 3B and its operation, by the multilation of and the confusion relating to drawings illustrating a later developed model or by the absence of any records of Harrington Tool and Die Co. relating to the subsequently developed models. Similarly, we do not regard the credibility of the testimony of either Glenn or McGrath as to that first model (Exh. 3A, 3B) to be suspect. We do not regard it as unusual or particularly suspect that both identified the model and the photographs (Exh. 3A and 3B) as the structure they first saw in 1955 and 1956, respectively, even though Henderson's testimony, considered as against his interest clearly shows that the original structure was modified after Glenn saw it and possibly after McGrath saw it. We note that such modification resided solely in minor details that are wholly unnecessary to the function and use of the device as set forth in the counts here in issue and are of such a nature as not to be readily discerned or appreciated unless they were particularly directed to a viewer's attention. We believe this to be especially so where, at the time of the viewer's first meeting or impression of the device, he was unacquainted with the problem that it was to solve and was only generally concerned with the structure but was more specifically impressed with the results.

Kravig presents four main points in contending that the board erred in finding reduction to practice of the precursor of Exhibits 3A and 3B in 1956. Expressed generally, they are (1) that there is not adequate corroboration of the testimony of Henderson as to the structure of the device; (2) that the testimony on which reduction to practice was found is based completely on oral recollection

and hence deficient; (3) that the "mutilated" drawings of which the board said it was "painfully aware" should have been regarded as having "infected or polluted" Henderson's oral case as a whole; and (4) that the "precursor" device was a crude device which could not have been "an equivalent of the machine disclosed in the parties' specifications, or satisfactory in operation, or even complete in form."

Kravig also argues (reference to record page omitted):

Had the Board considered the case for Henderson as reflected by the documents which are in the record, it would have found that the oral testimony established no more than an abandoned experiment, and that Henderson's uncorroborated oral testimony was unreliable. Had the Board further taken into account the case for Kravig (which it expressly ignored, * * *), it properly could have found the most plausible explanation of Henderson's case to be that he was stimulated into action by his contacts in March 1958 with representatives of Kravig's assignee.

■■ To the extent that the board found the precursor of the structure *illustrated* in Exhibits 3A and 3B was reduced to practice, we do not agree with Kravig's contention that there is not adequate corroboration of the structure of the device. The testimony of Glenn and McGrath is definite as to the elements shown in the exhibits having been used to make bows. The testimony also is convincing that the changes made in the illustrated structure were not such as to cause a different operation even though Henderson himself was the only one who testified as to the precise nature of the changes. As is stated in Mann v. Werner, 347 F.2d 636, 52 CCPA 1578:

* * * This court has rejected the notion that each individual act in the reduction to practice of a count must be proved in detail by an unbroken chain of corroboration. See Patterson v. Hauck, 341 F.2d 131, 52 CCPA 987; Gianladis v. Kass, 324 F.2d 322, 51 CCPA 753; Hasselstrom v. McKusick, 324 F.2d 1013, 51 CCPA 1008. As we said in the latter case, "the purpose of corroborative evidence is to confirm and to strengthen the testimony of the inventor." The proper approach, we believe, involves a reasoned examination, analysis and evaluation of all the pertinent evidence bearing on the question, to the end that a reasoned determination as to the credibility of the inventor's story may be reached.

■ However, we think this evidence proves reduction to practice only of counts 1 and 2. The "shaft for receiving and rotatably supporting a supply roll of ribbon," recited in counts 3 and 6 is not shown in Exhibits 3A and 3B nor is it included with the model of which they are photographs. It is true, as noted by the board in its decision on reconsideration, that Henderson in his testimony did describe a separate stand as provided to support such a shaft and in fact marked on Exhibit 3A the location for it next to the base of the photographed model. On the other hand, Henderson does not specifically state that such shaft was used in demonstrating the model to Glenn and McGrath or in making bows he used as samples for his accounts and neither of the corroborating witnesses even refer to the existence of such a shaft.

The board's position on this point, stated in its decision on reconsideration is:

The testimony establishes that the witnesses saw Henderson demonstrate the device by making ribbon bows. It *must* be concluded that there was a supply of ribbon there and there is nothing in this record (Kravig et al. on Henderson's testimony pp. 15, 16 to the contrary) which indicates, or leads us to believe, that the ribbon supply supporting structure described by Henderson was *not* present when they saw the demonstrations. It is not apparent *when* that supporting structure disappeared or *where* is happened.

We cannot agree with that analysis. While it must be concluded that there was a supply of ribbon during the demonstrations, there appears to be no reason that such supply had to be in the form of a roll rotatably supported on a shaft. So far as the testimony is concerned, only one or a very few demonstration bows might have been made at any one time and the source of material could have been a long length of ribbon already removed from its roll or a roll of ribbon merely resting on a table or the floor.

The mere fact that the board's finding of reduction to practice is based on corroborated oral testimony not supported by a dated exhibit does not warrant reversal of the board's decision and the decisions cited by Kravig do not so hold. In Walker v. Altorfer, 111 F.2d 164, 27 CCPA 1130, appellee's admission that documentary exhibits, "upon which much of the oral proof concerning reduction to practice depends, have been changed or altered" was found to be an element of weakness in a case requiring proof beyond a reasonable doubt. By contrast, the dates asserted with respect to the model found reduced to practice here were based on association with events established independently of the "mutilated" drawings. Moreover, evidence of the actual existence of the model (Exhibits 3A and 3B) was produced in the present case and all three witnesses with knowledge thereof fixed a date not later than spring of 1956 with respect to it.[1] While the model had been altered subsequent to that date, the alterations were in the nature of efforts toward improvement and their lack of pertinence

to the broad subject matter of the counts was satisfactorily established.

We further see no error in the board's view that the confusion in the record with respect to some of the activities in Canada including the "mutiliated" drawings does not constitute a basis for doubting the credibility of the testimony with respect to the first model or cast suspicion over Henderson's entire case. Exhibits 7, 7A, 17, 18, 23 and 35 have not been given any weight in finding reduction to practice and the earliest date that might be urged for any of them, July 6, 1956, is later than the date found to have been proven for reduction to practice by other independent evidence.

The "mutilations" involve a print of a drawing in which the part of the legend box had been blocked out or cut out and a tracing, introduced as Exhibit 35, with a legend bearing the date of July 6, 1956 in the form of a cut-out attached by tape. Although those matters are not explained, the absence of an explanation is at least partially accounted for by the fact that Henderson's draftsman, Dubois was not available to testify because of his death some time previous to the taking of testimony. The latter tracing was provided by the draftsman's widow from his effects. Further, the witness Weedmark testified that at times legends are cut out of tracings for either of two reasons. One is to save expense by reusing the legend when an older drawing of a structure is replaced by a modified drawing and the other is to avoid revealing information to another concerning a customer when a drawing is sent to an outside shop for

---

1. In addition, Henderson's witness Weedmark of Harrington Tool and Die Company of Canada stated that Henderson gave him a model on May 17, 1957 and, when asked whether that model resembled what is shown in Exhibits 3A and 3B, testified:

\* \* \* A. Yes, it did. I cannot say that it is identical but it is substantially the same model. I have been asked this question before; and the one stipulation, the reason that I cannot tell is because I cannot see underneath that

table whether that is a rubber drive or a ratchet drive.

Q64. Would you indicate the parts that are in the model and that are shown in this drawing? A. The whole base, such as the letters G, P, Q, the handle L, F, the shuttle K, the prong to hold the ribbon down J, and L, the pin on which the ribbon was impaled; the other spring in here C, which held it down. Basically it is the same piece of equipment.

reproduction. In the latter case the legend is put back on the tracing when it is received back. Therefore, we do not think that the absence of a clear explanation of the "mutilations" justifies a refusal to believe testimony for Henderson on independent facts found to establish a reduction to practice earlier.

The present situation is clearly distinguishable on the above factual basis from Globe-Union, Inc. v. Chicago Telephone Supply Co., 103 F.2d 722, (7th Cir. 1939) cited by Kravig. There, certain diaries of the appellee, found to be of highly doubtful authenticity by the court, related to the very acts on which the finding below rested. Moreover, the court additionally relied on other suspicious aspects of the appellee's case in reversing the decision below.

We have not overlooked a conflict in testimony between Henderson and one Birkins, a sales employee of Kravig's assignee, 3M,[2] about their first meeting. Henderson stated he met Birkins at the Toy Fair in New York early in 1957 while Birkins stated he first met Henderson at the Fair held in March 1958 and produced records to show entertainment of Henderson at that time. Since there apparently were several meetings between Henderson and Birkins and other 3M representatives over a considerable period, we are unable to find anything in the conflicting testimony in this record that is thoroughly convincing either way with respect to the first meeting; neither do we find the conflict to discredit the testimony of Henderson relative to the *first* model or otherwise of any controlling significance, particularly since the date fixed by each for the meeting is subsequent to the acts on which the board's finding of reduction to practice by Henderson is based.

■ Kravig urges that Henderson acquired a Kravig machine from 3M by a lease dated April 5, 1959 which is prior to the time he executed an oath in his application filed December 28, 1960 swearing that the subject matter had not been in public use more than one year. He also notes that an affidavit Henderson submitted during the prosecution of his applications states that, prior to July 23, 1958, he had conceived and "had constructed at the plant of his * * * company in Plattsburgh," a machine similar to that disclosed in his application and notes that the evidence does not show that any machine was "constructed" in Plattsburgh by that date. We do not see that these matters are sufficient to discredit the credibility of the testimony of Henderson and his corroborating witnesses regarding the much earlier first model. Of course, the question whether there is a public use bar under 35 U.S.C. § 102(b) against Henderson as to the counts in issue is a matter distinct from the present proceedings and is not before us for determination. It is also of interest that, although the facts as to an alleged public use through rental of a Kravig machine have been available to Kravig along with knowledge of the filing date of Henderson for a long time, the record does not reveal that Kravig took any action to have that question determined before the interference was decided.

■ Kravig further argues that Henderson's first model was so crude as not to be the equivalent of the machines disclosed in the parties' specifications and thus cannot be a reduction to practice. It is apparent that the device was crude compared to the structures ultimately developed, but it is also evident that it embodied the invention defined in counts 1 and 2. The invention is a machine for making bows and we think it was reduced to practice when the crude machine embodying the structure of counts 1 and 2 was operated to accomplish that desired result. The record does not indicate that there was any problem as to the environment in which the machine operated; the bow making machine is not a guidance or control component, or an element of another machine of such type that operability must be determined within the

2. Minnesota Mining and Manufacturing Company.

operating context of the whole machine. The model did prove out the principle of operation and there is evidence that bows made thereby were used as samples by Henderson. We see no merit in the additional point, urged by Kravig, that there is no showing that the bows produced were stapled together by the machine, since the counts do not specify that the machine include any means for permanently securing the loops together while thereon.

The fact that Henderson expended much additional time and effort before he obtained machines operating on the principle proved by his first machine which were commercially satisfactory does not negative the finding of reduction to practice since it is well-established that commercially satisfactory performance is not necessary to an actual reduction to practice. Tansel v. Higonnet, 215 F.2d 457, 42 CCPA 732; Creamer v. Kirkwood, 305 F.2d 486, 50 CCPA 715. We also agree with the board that, under the circumstances here, the fact that Henderson did not file his application until more than five years after his activities in connection with the operation and demonstration of the precursor of the model of Exhibits 3A and 3B does not show that those activities fell short of an actual reduction to practice. See Knowles v. Tibbetts, 347 F.2d 591, 52 CCPA 1800.

Our conclusion that the board erred in finding the evidence to show that the precursor of the machine of Exhibits 3A and 3B that was reduced to practice included a shaft for receiving and rotatively supporting a supply roll leaves the question of whether the extensive evidence in the record of later activities of Henderson entitles him to an award of priority as to those counts. That determination requires consideration of what the board designated "an extremely confusing record" but did not specifically analyze from the standpoint of actual reduction to practice or diligence. Also, it may well require consideration of Kravig's evidence to determine when he entered the field, a determination the board found unnecessary because of its conclusion Henderson had proved reduction to practice of all counts prior to any date asserted by Kravig. It will, therefore, be necessary to remand the case as to counts 3 and 6.

The decision of the board is affirmed as to counts 1 and 2 and reversed as to counts 3 and 6. The appeal is remanded to the board for action consistent with this opinion in connection with the question of priority as to counts 3 and 6. This remand, however, is not to be construed as barring the suspension of further proceedings in this interference for the institution of public use proceedings if steps are taken which the commissioner regards as rendering such suspension appropriate.

Modified and remanded.