Harold J. Kinney, Stanley G. DeLaHunt, Kinney, Alexander, Sell, Steldt & DeLaHunt, St. Paul, Minn., Thomas V. Koykka, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for appellants.

John J. Hart, New York City, for appellee.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and KIRKPATRICK*, Judges.

55 CCPA

**Robert S. KRAVIG and Arnold E. Johnson, Appellants,**

v.

**David J. HENDERSON, Appellee.**

**Patent Appeal No. 7862.**

United States Court of Customs and Patent Appeals.

May 16, 1968.

Rehearing Denied July 3, 1968.

RICH, Judge.

This case is here on Kravig's petition for further review, having been previously before us as reported at 362 F.2d 1015, 53 CCPA 1534, to which reference is made for background. The parties rebriefed the case in March 1968 and reargued it on April 3, 1968.

In the opinion by the late Judge Martin, July 14, 1966, we reported our unanimous decision to reverse the award of priority by the Board of Patent Interferences to Henderson on counts 3 and 6 and to remand to the board on those counts. On remand, the board awarded priority to Kravig. As to counts 1 and 2, however, we affirmed the board's award

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

of priority to Henderson. Only the latter two counts are here involved.

 Henderson, as junior party, had the burden of proving priority beyond a reasonable doubt, the counts having come from Kravig patent 2,933,223, which issued before Henderson's application was filed. The board concluded that Henderson had established introduction of a machine, illustrated in Exhibits 3A and 3B,[1] which the board thought embodied the invention of all four counts, into the United States from Canada in the spring of 1956. In consequence, the board held Henderson had a reduction to practice in the United States at that time. Henderson had to overcome at least the filing date of the Kravig patent, July 23, 1958.

We formerly reversed only as to counts 3 and 6 on the ground that the machine of Exhibits 3A and 3B did not support those counts. It was not disputed that it supported counts 1 and 2 and we affirmed as to them because we, like the board, accepted the proofs as to the date that the machine was in the United States.

In making our prior decision, we remanded the case to the board for further consideration of evidence in the record with respect to counts 3 and 6 which it had not deemed it necessary to consider. Before the board rendered any decision on that remand, Kravig came to this court with a motion to recall our mandate and vacate the judgment on the ground of fraud, with respect to counts 1 and 2, submitting in support copies of depositions taken, subsequent to our prior decision, in Canada. Appellant's assignee, 3M, prosecuting a suit in the United States District Court for the Northern District of New York, in Utica, New York, entitled Minnesota Mining and Manufacturing Company v. Aranac Ribbons Inc. and David J. Henderson (Civil Action No. 65 CV 134), obtained an order therein for a rogatory commission, confirmed by order of the Superior Court of the District of Montreal, pursuant to which the depositions were taken before William S. Tyndale, Q. C., as Commissioner, at the Harrington Tool and Die Co., Ltd., plant in Lachine, Quebec. Henderson, appellee herein, was present and represented by counsel. There are three volumes of stenographic reports of the depositions totalling 348 pages plus numerous exhibits. After we had considered them on the motion, by order of February 6, 1967, we granted Kravig's motion to the extent that we enlarged our final order (or mandate) on the prior appeal "to include a remand to the Board of Patent Interferences for consideration of the evidence in the above mentioned depositions." At that time we expressed no opinion on the evidence or on Kravig's allegations of fraud, desiring, as a court of review, not to pass on any matter relating to priority, or the evidence relating thereto, which had not first been considered by the board.

Pursuant to our mandate, the board, on March 10, 1967, without seeking or having briefing or argument from the parties on the question raised by the new evidence, rendered a decision on our original remand with an extensive opinion in which it found nothing in the original evidence to support an award of priority to Henderson on counts 3 and 6 and therefore awarded priority thereon to Kravig.

Responsive to our enlarged remand to consider the new deposition evidence obtained in Canada, the board made only the following brief statement:

> In accordance with the Court's mandate *we have considered the evidence* in the depositions and related exhibits relating to fraud and we find that *it is insufficient to support any action by us.* [Our emphasis.][2]

---

1. Exhibits 3A and 3B, as stated in our earlier opinion, were recent photographs of a model about which oral testimony was given in the interference, the model itself having been before the witnesses, the board, and this court. We have it before us now. It is sometimes referred to herein as Henderson's "first model."

2. This laconic comment leaves us wholly in the dark as to the reasons for the board's conclusion.

Henderson has not appealed from the award of priority against him on counts 3 and 6 and the decision on them is final.

As to counts 1 and 2, Kravig asks us, on the basis of the deposition evidence taken in Canada subsequent to our prior decision, which has now been reviewed by the board, which took no action thereon, and which has now been certified to us by the Patent Office as part of the record, to set aside the earlier award of priority to Henderson and award priority to appellants. Error is alleged in the board's failure to do this. Kravig's petition briefs this question and Henderson has filed a reply brief making only the following points: (1) the decision of the board saying it found nothing to support any action by it is not a decision on priority and there is no basis in statute or rules for our considering it; (2) the decision of the board is only "procedural" for which reason we are not authorized to review it; (3) the question before us is not "ancillary" to priority and so not reviewable; (4) the priority issue is also involved in the suit in the District Court for the Northern District of New York and 3M will have ample opportunity to prove its contentions there for which reason, we presume he thinks, we should consider the issue no further; (5) no reason has been given why the deposition evidence was not presented previously. We see no merit in any of these arguments. In reviewing them we have noted with interest that there has been no refutation of Kravig's primary contention now before us that the new evidence shows that the machine allegedly brought into the United States from Canada in 1956 was not built until 1958, a point which has a vital bearing on the central issue of priority and which we shall now consider.

As above indicated and as our former opinion shows, our affirmance of the board's award of priority on counts 1 and 2 to Henderson was based entirely on our acceptance of evidence that the machine depicted in photographic exhibits 3A and 3B was introduced into the United States from Canada at least as early as 1956, thus antedating any date asserted by Kravig as an actual reduction to practice. The evidence, as the board initially recognized, was oral testimony of the party Henderson corroborated by the oral testimony of two of his own employees, all given eight or nine years after the alleged events.

The crux of the matter now before us is that the evidence Kravig subsequently obtained in Canada flatly contradicts the evidence on which we relied in reaching our prior decision. We shall review the essential points.

Henderson, a Canadian, operated two companies: Beacon Ribbon Mills Ltd. and Aranac Ribbon Mills Inc., the former owning the stock of the latter. Beacon was a Canadian corporation located at Valleyfield, Que. and Aranac a New York corporation located at Plattsburgh, N. Y. He testified, "you might say it is a one man's business." The business was ribbon and bow manufacturing. The Plattsburgh operation was initiated under the Beacon name, later changed to Aranac, and was limited to the manufacture of bows. It began April 1, 1955, at 49–51 South River Street. About five months later he moved to another location across the street at 70 South River Street. Upon coming to Plattsburgh, Henderson met Robert E. Glenn who owned and operated a parking lot adjacent his newly rented factory. Glenn had, until 1954, worked at the Pal Razor Blade plant in Plattsburgh which had been sold to American Razor Company and closed down and shortly after meeting Henderson, who was looking for someone to run his new plant, went to work for him. In 1964, when the interference testimony was taken, he was his plant manager. Shortly after the Aranac plant was moved, Thomas G. McGrath, an employee of Plattsburgh Foundry and Machine Company in maintenance work, met Henderson in connection with moving some Pal Blade machinery out of the building at 70 South River Street. Mr. Henderson and Mr. Glenn, McGrath testified, rented an air compressor from the Plattsburgh Foundry and McGrath was

in charge of installing and maintaining it, by reason of which he was frequently in the Aranac plant. That was in July 1958. In 1959 the foundry built a complete machine for Aranac and McGrath did much of the work on it. At the time the testimony was taken, McGrath was working part time for Aranac and had so worked for three or four years previously. These are the dramatis personae, Henderson, Glenn, and McGrath.

The evidence initially taken in the interference tells of the building of a whole series of bow-making machines, from a first crude, hand-operated model (note 1, supra) with a single bow-making head, to several multiple-head, power-operated machines which, after much travail, were finally capable of commercial production. In the sequence of events developed in what the board characterized repeatedly as "an extremely confusing record," the only matter of importance here is the date when the first crude model (illustrated in photographs, Exhibits 3A and 3B) was in being and introduced into the United States so as to constitute an actual reduction to practice in this country. The board found such a reduction to practice prior to Kravig's filing date. It did so on the basis of the actual model before it, the oral testimony of Henderson, and the supposedly corroborating oral testimony of Glenn and McGrath.

Summarizing the story told by these witnesses, Henderson said he got the idea for the machine from fixing his daughter's record-player in 1954, went to his bench a few days later, got out some metal, and put together the first model (a working model) which, in admittedly modified form, he produced before the board. He fixed the year only by association with a move of his Valleyfield plant from one location to another. He produced no scrap of supporting documentation referring in any way to this first model. The photographs of the model were taken only three days before the testimony for use in the interference. These alleged activities were all in Canada. He said he made the model from a few pieces of scrap in the Valleyfield plant. This model, Henderson said, he brought to Plattsburgh when he opened his plant there in April 1955. He said "at that time" he showed it to Mr. Glenn, that they made sample bows on the machine in Plattsburgh, but only samples, no production. He said he showed it to Glenn in his first plant in Plattsburgh. He thought the machine too slow, however, and "let it go" allegedly turning his attention to a second machine in 1955, using the same "basic ideas."

As the board correctly pointed out, this testimony would have availed Henderson nothing unless corroborated. Glenn was one corroborating witness and testified Henderson showed him the first model not later than June 1955 and explained how it worked, in the building at the edge of his parking lot. He also testified that later, when he was working for Aranac, they were still making bows entirely by hand in the summer of 1957 and that the first machine "successfully completed" was in 1958. However, in the summer of that year they were having so much trouble with production on later power-driven machines, made in Canada by Harrington Tool and Die Co., that he quit.

Q. Did the operation of this machine have anything to do with your leaving Aranac Mills in Nineteen fifty-eight? A. Yes, it did.

Q. Will you please explain the reason? A. Well, for approximately two months after the receipt of these machines in Plattsburgh, I was spending about twelve to fourteen hours a day, from early morning to late evening, trying to get the machine to run properly and finally got disgusted with the whole detail and, in so many words, said "the devil with it", I did not have to do this whole thing this whole summer. I had other things coming up with my own personal business on the side, and I said—"Life is too short to put my chest against a wheel", and gave up trying to get things going.

For the last of 1958 and 1959 he said he did nothing except supervise his parking lots.

Mr. McGrath was the only other corroborating witness as to the date the first model was allegedly in the United States. He testified that he first met Henderson in the spring of 1956, that he recognized the model shown in Exhibit 3A and 3B, that he called it a "gadget," that it was in the office the day he was down in the building packing up Pal Blade machinery. This is his entire direct testimony on that particular machine:

Q. When did you see this machine? A. This machine here and this view, if you want to call this machine at the time I saw it, I called it a gadget, it was in the office the day I was down there packing up machinery. Mr. Glenn invited me over to their part of the Ribbon Mill which was separate from where we were working and he asked me if I wanted to see something. I went over and Mr. Henderson made a bow on this machine, which amazed me.

Q. Did they explain to you how this worked? A. Well, not too thoroughly, we ran over the thing briefly, and as I recall at the time they were interested in finding some way to fasten the bow after it was made and wanted to know if we had any suggestions. I wasn't too familiar with it. I saw the thing made and I had no suggestions at the time as to how they could finish it.

Q. Did you understand how the machine operated? A. Yes, the machine was a simple operation the way he explained it I had no trouble following him. That is about the extent I am familiar with this machine.

We turn now to the relevant later testimony obtained by Kravig's assignee, 3M, by means of the rogatory commission. It relates to this same first model,

Exhibits 3A and 3B, the time, place, and circumstances of its creation, hence, it relates directly to the issue of priority, which issue was decided by the board and this court solely on the existence of this first model in the United States in 1956.

To start with a summary of what the new evidence appears to show, as stated in Kravig's Renewal Petition.

The device actually was built "from scratch" at the request of, and for, appellee Henderson in the five-day period May 12–17, 1958, in the shops of Harrington Tool & Die Co., Ltd., in Lachine, Canada * * *.

The Commissioner took the depositions December 7, 1966, in the board room of the Harrington Company. The first witness was Gordon McNaught, its Vice-President. He brought, under subpoena,[3] certain company records which he identified and explained. It appears that Henderson had been a customer on other matters than the bow-making machine here involved, that on May 12, 1958, he gave a verbal order as shown on an Order Sheet for a single "prototype" ribbon-forming machine, which order was designated "S–15430–A 1." Delivery May 14 was requested or promised as shown on the Order Sheet. "S" meant the machine was to be built according to a sketch and that the sketch was made by Harrington, not the customer, "A" that it was a first issue (a second machine of the same kind would be called a B issue) and "1" that one of them was ordered. The customer was named as "Beacon Ribbon Mills, Valleyfield, P. Q."

Another Harrington record in evidence is the Customer Engineering Card for the individual customer. This is headed "Beacon Ribbon Mills Limited" and the second item on it reads "MACHINE, Ribbon Forming, Prototype, DWG. #S–15430 Inter: May 12/58 S–15430." There is an individual job Engineering

---

3. There is rather persuasive evidence in the depositions and exhibits that attempts to get information from Harrington personnel by Kravig were frustrated until the commission and the issuance of subpoenas. In fact, Henderson, in November 1966, threatened Harrington with legal action if it gave out any information to his damage.

Card carrying the designation "No. 15430" bearing the notation "Inter: May 12/58" an entry under the printed heading "DATE" of May 13/58, a delivery date of May 14/58, the title "MACHINE, Ribbon, Forming, Prototype," the customer name is Beacon Ribbon Mills, and a cost entry "59¾—238.15." The former item is hours, the latter is dollars.

There is a printed form entitled with the Harrington company name and "FACTORY COST RECORD," relating to "Job No. S 15430—A1," with "Date of Issue May 13/58" and "Delivery Date May 14/58" itemizing some 20 material units and their costs, "total labour" and a total cost of $238.15. There is reference to a shipping record "B–51071–1–May 17." Under "Remarks" is the date "May 26/58." On the reverse side is the "Labour Record" showing the names of five workmen, their clock numbers, charge rates, and time spent on various stated operations, with calculated labor charges and overhead.

There are 9 individual Harrington workmen's parts orders, requesting materials from stock, dated May 12, 14, and 15, attached to a job sheet identifying the customer, machine, order and delivery dates marked "Date of Issue: May 13/58."

Finally there is the Delivery Record, dated May 17, 1958, No. B 51071, addressed to Beacon Ribbon Mills on "1 Ribbon Forming Machine for trial."

The above exhibits all bear the mark of regular, orderly, entries in the ordinary course of business of a machine shop. They all tie together, they all identify the same machine, there seems no possibility of questioning the authenticity of the dates they bear. The next question is whether they pertain to the first model shown in Exhibits 3A and 3B in its original form. There can be no doubt that a "prototype" ribbon-forming machine was built by Harrington for Beacon Ribbon Mills in May 1958; we have only to relate it to the one about which testimony was given initially and which was produced before the Patent Office and this court. This brings us to the witness Tobber.

Arno W. Tobber is a mechanical engineer educated in Danzig, employed by Harrington from 1957 to 1964, first as Works Manager and Chief Engineer and finally as Vice-President of Engineering and Manufacturing. When shown the first model, of Exhibits 3A and 3B, he said it looked very familiar, "it looks exactly the same as the one I designed." Explaining the circumstances behind that response he said that Mr. Henderson was brought to him as a customer and explained to him that he wanted a machine built to do a certain operation—a cheap simple thing that could even be made of wood—that he wanted it in a hurry. With a pin or pins and a disc which he could hold in his hands and some ribbon Henderson showed him what he wanted to accomplish. It was a Thursday or a Friday and Tobber decided not to give it to a designer from the shop "who would tend to make a neat drawing and take a long time" so he did it himself at home over the weekend. He said no complete device was brought to him, that it was explained that it should function to place ribbon on a needle, which would turn so a loop could be formed, then the ribbon would rest on the needle and another loop would be formed and so on. Coming back from the weekend he gave the shop a sketch to have the device made. The sketch appears to have been lost or destroyed.

With the first model here involved before him, marked as deposition Exhibit No. M–11, M–11A, the same machine shown in Exhibits 3A and 3B, Mr. Tobber identified numerous of the detail items of material on the Factory Cost Record, supra, as they now exist in the machine in spite of alterations, more than half a dozen. According to his testimony, the machine was built to some extent on a cut-and-try basis and Mr. Tobber was able to say what changes had been made in this respect to make the machine operative. He also explained the reason for the existence of certain holes, for example, which no longer have any func-

tion as the machine stands now but which were used in trying out various arrangements of parts.

On the whole record, we are persuaded that the first model was actually made by Harrington Tool and Die Company; that clear documentation establishes the date of that manufacture as May 1958. If we are correct in this, then it is not possible that Henderson made the machine himself in his shop, as he testified, or that he took it to Plattsburgh in 1955 or that it was seen there by Glenn in 1955 or McGrath in 1956. Of course, it is entirely possible they saw it in Plattsburgh at some time many years before they testified and that their testimony is merely in error as to the date.

It also appears that immediately after the building of the first model by Harrington that plant proceeded with what might be described as a crash program to build bigger, better, and more commercial bow-making machines for Henderson with assistance by way of designing from others and that such machines were in Plattsburgh by late 1958 and 1959, where they had many troubles with them for some time. But these are not important to the issue here which is whether there was an operative machine meeting counts 1 and 2 in the United States before July 23, 1958. Since Henderson attempted to prove that there was evidence that the first model was in Plattsburgh in 1955 and 1956, which testimony we find ourselves unable to believe, we find the record to be devoid of believable proof that the first model, built in May 1958—the only one of its kind and certainly the earliest—ever left Canada, where it was built, prior to July 23, 1958.

At the very least, under the rule of law here applicable that Henderson must prove his case beyond a reasonable doubt, we must hold that on the whole record he has failed in that regard because of the substantial doubt cast on the proofs by the conflicts in the evidence.

We therefore are of the opinion that the board erred in failing to set aside its award of priority to Henderson on counts 1 and 2 on the enlarged remand in the light of the evidence subsequently obtained.

For the foregoing reasons, our prior affirmance of the board's award of priority of counts 1 and 2 to Henderson is vacated and said award is reversed, priority being awarded thereon to Kravig and Johnson.

Reversed.