MINNESOTA MINING AND MANUFAC-
TURING COMPANY, a corporation of
Delaware, Plaintiff,

v.

BERWICK INDUSTRIES, INC., a corpo-
ration of Pennsylvania,
Defendant.

Civ. A. No. 73–120.

United States District Court,
M. D. Pennsylvania.

April 1, 1974.

Hugh J. McMenamin, Warren, Hill, Henkelman & McMenamin, Scranton, Pa., Edward A. Haight, Britton A. Davis, Chicago, Ill., Stanley G. DeLaHunt, St. Paul, Minn., for plaintiff.

Bernard Beitel, Gainsburg, Gottlieb, Levitan & Cole, New York City, Arthur Silverblatt, Wilkes-Barre, Pa., John J. Dempsey, Springfield, Mass., for defendant.

## OPINION

MUIR, District Judge.

This is an action for infringement of United States Patents No. 3,112,240 and No. 2,933,223, relating to decorative ribbon bows and the apparatus and methods for making such bows. The Plaintiff Minnesota Mining and Manufacturing Company (3M) seeks damages and a permanent injunction against further infringement of said patents by Berwick Industries, Inc. (Berwick). The jurisdiction of this Court is predicated upon the fact that this is an action arising under the patent laws of the United States. Defenses denying infringement and challenging the validity and enforceability of the patents have been pleaded. Certain defenses are also raised affirmatively in three counterclaims which collectively seek a declaration that the patents in suit are invalid and not infringed by Berwick, and trebled damages, costs and attorney's fees as a result of alleged unfairness resulting from 3M's assertion of the patents. By an amended answer, Berwick has pleaded the defenses of laches and estoppel barring all relief. On motion by Defendant, the defenses of laches and estoppel were tried first, and evidence on these issues was presented during five days of trial beginning January 7, 1974.

## I. FINDINGS OF FACT.

1. The Plaintiff, Minnesota Mining and Manufacturing Company, is a Delaware corporation and has its principal place of business at St. Paul, Minnesota.

2. Berwick Industries, Inc. is a Pennsylvania corporation and has a regular and established place of business in Berwick, Pennsylvania. The alleged acts of infringement here complained of have occurred primarily at Berwick's Pennsylvania facility and at its facility located in San Juan Bautista, California, sometimes referred to as Berwick's "West Coast Plant."

3. United States Patent No. 2,933,223 was issued to 3M on April 19, 1960 on an application filed on behalf of Robert S. Kravig and Arnold E. Johnson on July 23, 1958. United States Patent No. 3,112,240 was issued to 3M on November 26, 1963 on an application filed on behalf of Robert S. Kravig and Arnold E. Johnson on October 4, 1962, which application was a continuation of an earlier application filed on October 29, 1959 as a division of the original application of July 23, 1958 which resulted in U.S. Patent No. 2,933,223.

4. Although Robert S. Kravig and Arnold E. Johnson had in the late 1950's been the inventors of the bows and the apparatus and method for making them which thereafter became the subject of the patents, neither Kravig nor Johnson own or have any beneficial interest in the patents. The applications for the patents were assigned by the inventors to 3M, and 3M has been the owner of U.S. Patent Nos. 2,933,223 and 3,112,240 since their respective dates of issuance.

5. Patent No. 2,933,223 (hereinafter referred to as the '223 patent) relates to a method and apparatus for forming decorative bows from continuous legnths of ribbon. Patent No. 3,112,240 (hereinafter referred to as the '240 patent) relates to decorative bows formed from continuous lengths of ribbon.

6. The method and apparatus for fabricating decorative bows of the '223 patent and the bows per se of the '240 patent were initially the subject of a single patent application, Serial No. 750,396, filed on July 23, 1958. During the prosecution of that application, the Patent Office indicated that the bows were to be regarded as a separate and distinct invention from the method and apparatus and, hence, ruled that the bow claims should be removed from the parent application and made the subject of a separate divisional application. This was done on October 29, 1959 by the filing of divisional application Serial No. 855,484. On October 4, 1962, a continuation application, Serial No. 228,497, was filed to replace the earlier divisional application and the '240 bow patent issued as a result thereof on November 26, 1963.

7. Berwick is charged with having infringed claims 1, 2, 5, 14, 15 and 17 of the '223 patent by its use, since February 23, 1967, of Tye-Sil, Ragen, Cambarloc and Wanchek bow machines. Infringement of claims 1, 2, 4 and 5 of the '240 patent is alleged by reason of Berwick's manufacture and sale, since February 23, 1967, of bows made on the Tye-Sil, Ragen, Cambarloc and Wanchek machines.

By way of illustration, claims 1 and 14 of the '223 patent read as follows:

"1. In a machine for making decorative bows from a continuous length of ribbon or strip material, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto and rotatively therewith ribbon applied there against, said feed means operating successively to apply portions or ribbon spaced along the continuous length thereof against said retaining means successively to form radiating loops of ribbon."

"14. In fashioning a decorative bow from a continous length of strip material, the steps comprising: grasping a length of strip material adjacent its free end and at a point spaced therefrom unidirectionally twisting the portion of ribbon between the points where grasped and bringing the strip material at said free end and at said spaced point together in increased intersecting face-to-back relation to form a first loop having a first leg adjacent said free end, a second leg adjacent said space point and a smoothly arcuate bight; fastening the legs of said loop together at their point of intersection; grasping said strip material at said point of intersection and at a third point along said length spaced from said point of intersection, twisting the strip material between said point of intersection and said third point unidirectionally in the same relative direction as before and bringing the strip material together at said point of intersection and said third point together at said point of intersection in intersecting face-to-back relation to form a second loop having a first leg which is common with and a continuation of the second leg of said first loop, a second leg adjacent said third point and a smoothly arcuate bight; and fastening said loops together at said points of intersection."

Claim 1 of the '240 patent reads as follows:

"1. A decorative bow comprising a continuous length of strip material formed into a succession of loops radiating from a generally central point along at least three radii, said length terminating with its ends adjacent opposite surfaces of the bow defined by said loops, said loops each having a first leg, a second leg overlying the first leg at said central point and a bight with each loop having one leg common with the opposite leg of each loop in immediate succession therewith, each of said loops having therein a unidirectional twist with the bight thereof being smoothly arcuate, the same surface of said strip material being exposed outwardly in each loop, the superposed layers of said strip

material at said central point being impaled by central holding means which penetrates said layers and retains said loops together at said central point, the strip material of said layers being laterially displaced in areas immediately adjacent said holding means."

8. About 1959, 3M introduced its S-71 bow machine which was hand-powered and designed for the retail market, i. e., the gift wrapping counters in department and variety stores. About 1964, the S-71 was replaced by an improved hand-powered model designated as the S-72. An automated, production type bow making machine designated as the S-73 was offered by 3M for industrial use beginning in the spring or early summer of 1961. Since the issuance of the '223 patent, each of these machines has borne notice of that patent in accordance with § 290 of Title 35 U.S.C. In the mid-1960's, 3M discontinued the production, sale and leasing of bow machines.

9. 3M has never been engaged in the manufacture and sale of decorative bows described in the '240 patent, but at times since the issuance of the '223 and '240 patents has manufactured and sold ribbon suitable for the production of bows on manual and automated machines.

10. Berwick's initial entry into the business of manufacturing the bows here involved occurred through the purchase on November 18, 1960 of an Augsburger bow-making machine from Paterson Instrument Corporation of Paterson, New Jersey, at a price of $4,500.00, which machine was in operation for about 8 years.

11. The Augsburger machine produced star bows which are identical to the star bows presently produced by Berwick on the Tye-Sil, Ragen and Wanchek machines, the production and sale of which are claimed by 3M to infringe on the '223 and '240 patents.

12. At the time Berwick purchased its first bow-making machine and at least as early as December 22, 1960, 3M was attempting to develop an automatic staple-type bow-maker known as the S-73 in order to meet the competition of the Augsburger machine. Among 3M's personnel involved in the development program were A. H. Redpath, Head of the Tape and Gift Wrap Division, Arnold E. Johnson, the co-patentee of the patents here involved, and V. R. Nelson, one of 3M's engineers.

13. On April 27, 1961, Berwick placed an order for 3M's S-73 bow machine which was installed at Berwick's plant on August 17, 1961 at an annual rental of $1,950.00.

14. Berwick on June 27, 1962 purchased from the Paterson Instrument Corporation a second Augsburger machine at a cost of $5,000.00.

15. In 1961 and 1962, Berwick produced two to three million bows per year, and about five million per year in 1963-1965. Using the two "Augsburger" machines, it sold bows through wholesalers and jobbers to industrial markets such as candy producers and department store users on the East Coast and in the South.

16. In 1966, there was a decided change in Berwick's business activity. Plastic bags, each containing 25 bows, designed for sale to retail markets had been introduced by the major bow manufacturers such as Chicago Printed String Co. and Berwick decided to follow suit. Salesmen were hired and retail contacts were established in variety stores and large chains such as Kresges, Woolworth, Zayre, and K-Mart. In 1966, Berwick's bow production increased to approximately eleven to twelve million bows per year, and continued to increase annually so that at the present time Berwick is producing over 100 million bows per year. Berwick now counts itself among the six or seven largest firms in the bow making industry.

17. Berwick's increased bow production required the acquisition of newer, faster bow making equipment. In 1966,

Berwick acquired eight Tye-Sil machines from a Canadian manufacturer. Use of the original "Augsburgers" was discontinued. Thereafter, Berwick acquired seven Ragen Bowmatics in 1967, four more Ragens in 1968, seven Ragens and a Cambarloc in 1969, another Ragen and three more Tye-Sils in 1970, two Ragens in 1971, two Wancheks in 1972, and another Ragen in 1973. The aggregate amount expended by Berwick in the purchase of machinery and parts, exclusive of the $9,000.00 spent for the two Augsburger machines, amounts to approximately $265,000. The expansion of Berwick's business during the 1960's resulted in substantial changes in the overhead and size of the company. Initially, Berwick occupied a plant of roughly 30,000 square feet and employed a few dozen people. At the time of trial, in Pennsylvania Berwick occupied over 100,000 square feet and employed several hundred people. In addition, Berwick has established a plant in California. The production and sale of bows constituted approximately 24% of Berwick's annual business. Without the right to produce and market bows, Berwick's competitive standing in the business in which it is engaged would be adversely affected to a serious degree.

18. In December, 1960, within one month after Berwick purchased its first Augsburger machine, Gene Keegan, the New York sales representative for 3M's Ribbon Division, called on Berwick's President, Frederick B. Doherty. Mr. Keegan advised Mr. Doherty that 3M knew that Berwick had an Augsburger machine and inquired whether Berwick would be willing to use 3M's ribbon to produce star bows of the type here involved on that machine. Mr. Keegan also gained permission to have A. E. Johnson, a co-inventor of the patents here involved, examine Berwick's bow producing operation, including the Augsburger machine.

19. In January, 1961, A. E. Johnson, then Assistant Division Engineer in 3M's Gift Wrap and Fabric Division and co-patentee of the '223 and '240 patents, examined the Augsburger star bow producing machine at Berwick's plant. On January 16, 1961, Mr. Johnson rendered a detailed report to 3M's representatives, including A. H. Redpath, General Manager of 3M's Gift Wrap and Fabric Division and later Division Vice President, as to Berwick's ribbon operation and an analysis of the Augsburger's construction and operation. Said report, among other things, notes that an important feature of the Augsburger machine, namely, "the machine index or bow generation as they call it, utilizes the same principle as on our S-71." In the context of the report, this observation concerned the mechanical device which drove the spindle, causing it to turn, or index, during operation. The next two sentences of the report are explanatory:

"In their mechanism the chain (same as our cord) is intercepted sharply causing a sudden impact which jerks the chain, whereas in our case, the load is gradually applied. The effect of this in their case is to cause an erratic spindle movement or index, which must be adjusted if bow size is changed or the speed of operation is changed."

The purport of the "machine index" comparison is that the Augsburger machine, like 3M's hand-powered S-71, employed a chain or cord to drive the spindle in contrast to the forthcoming automated S-73 which did not.

Johnson's report concluded:

"*Summary-Comparison of Augsburger vs. 3M Machine*

1. *Machine Speed.* Spindle for spindle, the machines should be equal in output. Two of our machines will have the output of one Augsburger. Our operation is machine controlled, i. e., fully automatic vs. Augsburger's operator-controlled operation, i. e., semi-automatic.

2. *Size Range & Adjustment.* 3M machine can be readily changed within the entire range of ma-

chine, i. e., up to 8″ diameter bow using all of our standard ribbons and widths.

Augsburger machine has several adjustments and change part requirements to vary bow size. Maximum bow diameter is 4¾″ using a maximum ribbon width of one inch.

3. *Production:* With the Augsburger, one operator can only run one machine. With our machine, one operator can run several spindles; we estimate at least four."

20. The star bows made on this Augsburger machine were of the type charged in this litigation to infringe the '240 bow patent which, as previously noted, did not issue until November 26, 1963, but had been applied for in 1958 by Johnson.

21. Other internal 3M memoranda reveal that Berwick's Augsburger machine was observed and noted by 3M personnel on two other occasions, an August, 1961 visit to Berwick's plant by V. R. Nelson, Johnson's assistant, and a December, 1961 visit by Johnson.

22. There are other indications that 3M was familiar with the use of Augsburger machines. An October, 1961, production cost analysis compared the costs of producing bows on the Augsburger and 3M's S–73. This report acknowledges that "an Augsburger machine or equal" was being used by the four leading bow producers at that time, Texlon, Chicago Printed String, Wright Ribbon, and Facile.

23. In May, 1960, A. H. Redpath, General Manager of 3M's Gift Wrap and Fabric Division, notified Chicago Printed String Company (C.P.S.) by letter of 3M's '223 patent, enclosed a copy of the patent, and invited license negotiations. These negotiations were held, but collapsed when patent counsel for C.P.S. wrote to 3M's patent counsel, Stanley Delahunt, and informed him that "no machine of Chicago Printed String Co., so far as we are informed, infringes any valid claim of the said patent."

24. Subsequent to these negotiations, 3M acquired sufficient information on which to base a charge of infringement, and by the summer of 1962, 3M was preparing to file an infringement action against C.P.S. No suit was filed, however, because at this point, on July 5, 1962, Interference No. 92,874 was declared between the primary claims of the '223 patent and an application of one David J. Henderson, a major participant in the bow industry. When this Interference was instigated, the validity of the '223 patent was considered to be in serious question, and Mr. Delahunt accordingly advised Redpath and 3M that no infringement suits should be filed until the matter was resolved.

25. The Augsburger machine used by Berwick and observed by 3M personnel, including the co-inventor Johnson, fell within one or more claims of the '223 patent as those claims were interpreted by 3M management and their patent counsel.

26. The star bows produced by Berwick on the Augsburger machine fell within one or more claims of the '240 patent as those claims were interpreted by 3M management and their patent counsel.

27. A. E. Johnson made the two visits to Berwick in his capacity as a field engineer for the purpose of assisting 3M salesmen in promoting the use of 3M material and equipment, and specifically for the purpose of comparing the practical competitive advantages of the Augsburger and 3M's machines. He was not sent for the purpose of investigating possible infringements of the '223 patent. However, as co-patentee of the patent herein involved, Johnson was the 3M employee most knowledgeable with respect to star bow producing machinery. At times Johnson was relied upon by 3M's patent counsel for technical advice on questions concerning possible infringement of the '223 patent. Thus, in about 1968, after observing a photograph of a Ragen bow machine, Mr. Johnson informed Mr. Delahunt that

the bow machine operated upon the same principles as 3M's machine.

28. A. E. Johnson's January, 1961 report about Berwick's Augsburger machine was sufficiently detailed to put 3M management on notice that the use of the machine involved a possible infringement of the '223 patent.

29. As early as January, 1961, 3M management knew, or should have known, that Berwick's use of the Augsburger machine was a possible infringement of the '223 patent. At that time, 3M knew or should have known that the bows produced by Berwick were almost identical to the bows which would become the subject of the '240 patent granted on November 26, 1963.

30. At about the time of Johnson's first field trip to Berwick in January, 1961, Berwick entered into a program through Keegan, one of 3M's eastern regional ribbon salesmen, whereby 3M's salesmen would accept orders on behalf of Berwick for bows made from 3M's "Sasheen" ribbon. From 3M's standpoint, the arrangement was thought to be advantgeous in that it would promote sales of "Sasheen" to Berwick. From the standpoint of Berwick, which had no real sales force of its own, the program was seen to be desirable in that 3M's sales organization could be utilized to promote the sale of Berwick's bows. By March of 1961, samples of "Sasheen" bows were prepared by Berwick for use by the 3M salesmen. The "Augsburger" machine was used for this purpose.

31. As stated in Finding of Fact #13, on April 27, 1961, Berwick ordered an automatic S–73 bow machine from 3M, and by August 17, 1961, the S–73 had been delivered and installed at Berwick's plant. Thereafter, for a period of about one year, Berwick utilized the S–73 alongside of the "Augsburger" machine to make star bows in conjunction with the sales program outlined in the preceding finding.

32. During the year following the delivery of the S–73 bow machine to Berwick, considerable maintenance problems with the machine were experienced, and in the summer of 1962 its use by Berwick was discontinued. The bow sales program was a disappointment to Berwick, and by November of 1962 its purchases of "Sasheen" ribbon had fallen off. On November 2, 1962, Mr. Doherty of Berwick advised 3M that it was no longer using the S–73 and wished to return it and discontinue the program stating:

> "The whole deal has not worked out the way we both anticipated so I have no further use for the machine."

On November 27, 1962, 3M's salesman, Birkens, apologized for the failure of the program, and on December 10, 1962, the S–73 was returned to 3M.

33. The S–73 leased by Berwick had affixed thereto a brass plate bearing the '223 patent number in ¼ inch print. At other times, Mr. Doherty, Berwick's president, observed S–71 and S–72 machines which were also marked with the patent number. Mr. Doherty never noticed these patent markings.

34. Mr. Doherty never consulted patent counsel concerning the legal implications of entering the bow industry and using various machines to produce the bows.

35. Until approximately 1971, neither Mr. Doherty nor anyone else at Berwick was aware of the existence of 3M's '223 and '240 patents.

36. Following Berwick's return of the S–73 in late 1962, there was virtually no contact between 3M and Berwick on the subject of bow manufacture. Sales of 3M ribbon to Berwick ceased in 1962, and an attempt by Berwick in 1966 to interest 3M in buying ribbon from Berwick also was short-lived.

37. As stated in Finding of Fact #16, as Berwick began increasing its bow production in 1966, the bows were marketed in bags containing 25 bows each. Each bow bag was marked with a notation that the bows were manufactured by Berwick. The bows were sold across the counters of several large re-

tail merchandisers throughout the United States.

38. From January, 1961, when 3M first observed Berwick's use of the Augsburger to produce bows, until June 25, 1971, 3M never advised Berwick of its patent claims.

39. On June 25, 1971, 3M's Division Vice-President A. H. Redpath wrote to Berwick offering a license under the '223 and '240 patents. Copies of the patents were enclosed. Subsequently, limited negotiations on licensing were conducted between the parties, but to no avail.

40. In October, 1972, Berwick signed an agreement with William E. Wright Co., another bow manufacturer which had also been solicited by 3M concerning licensing under the '223 and '240 patents. The agreement provided that the two companies would assist one another in the defense of any action brought by 3M and that neither company would accept licenses from 3M except by mutual consent. The agreement recites as the basis therefore:

"WHEREAS, 3M COMPANY owns U.S. Patents Nos. 2,933,223 and 3,112,240, and is asserting that the products and machinery of WRIGHT and BERWICK infringe said Patents, and under threat of suit for patent infringement has offered each of the parties hereto a license under said patents in the amount of $180,000; and

"WHEREAS, WRIGHT and BERWICK believe their products and machinery do not infringe said 3M patents and also that Patent No. 3,112,240 is clearly invalid and that Patent No. 2,933,223 is invalid to the extent that its claims are so broadly interpreted as to 'read on' the machinery used by WRIGHT and BERWICK; and

"WHEREAS, WRIGHT and BERWICK wish to resist the coercion of 3M and desire to lessen the overwhelming economic advantage of 3M in the prosecution of patent litigation by establishing a joint litigation fund with respect to these 3M patents."

41. The present infringement suit against Berwick was filed on February 23, 1973.

42. During most of the 10-year period of delay between 3M's first observance of Berwick's allegedly infringing activity and the offer of a license to Berwick, the subject matter of claims 1, 2, 5, 15, and 17 of the '223 patent, and claims 1, 2, 4 and 5 of the '240 patent, have been involved in two adversary proceedings determinative of their validity and enforceability: the first, a Patent Interference No. 92,874 declared by the Patent Office on July 5, 1962 between such claims of the '223 patent and an application Serial No. 98,043 filed December 28, 1960 by one David J. Henderson (sometimes referred to as the "Henderson Interference"), and the second, a suit filed on May 25, 1965 by 3M in the United States District Court for the Northern District of New York, Civil Action No. 65–CV–134, charging infringement of the '223 and '240 patents by Henderson and his company, Aranac Ribbon Mills (sometimes referred to as the "*Aranac* suit").

43. An Interference is a proceeding authorized by § 135 of Title 35 U.S.C. whereby priority of inventorship by two or more claimants to an invention may be adjudicated. Interferences are more often declared between two co-pending applications for a patent, but may, as was the case here, involve an issued patent ('223) and an application of a second claimant (Henderson) who copies claims from the issued patent within one year of its issuance. If the second claimant sustains his contention of priority, the claims in question of the issued patent are invalidated and cancelled from the patent. Moreover, the activities of the second claimant who thus prevails on the issue or priority will generally become prior art over which the validity of any remaining claims in the issued patent will be judged under §§ 102 and 103 of 35 U.S.C. in subsequent litigation on the issued patent.

44. With respect to the Interference, about eight months after the issuance of

the '223 patent Henderson filed a patent application wherein were described automated production type machines and a method for forming star bows thereon of a type claimed in the '240 patent. Along with the filing of his application on December 28, 1960, Henderson presented apparatus and method claims from the '223 patent. By letter dated February 16, 1961, Henderson informed the Patent Office that he had copied claims from the '223 patent, and by letter dated May 8, 1961, he requested declaration of an Interference to adjudicate that he, not Kravig and Johnson, was entitled to those patent claims.

45. 3M became aware of the Henderson Interference within a few days after it was formally declared on July 5, 1962. In the Interference, Henderson contended, in a required preliminary statement under oath, that he had completed his invention and reduced it to practice in 1955, more than two years prior to Kravig and Johnson's earliest dates of invention.

46. If Henderson's sworn contentions were upheld in the Interference, claims 1, 2, 5, 14, 15 and 17 of the '223 patent would thereby have been invalidated and cancelled from the patent. If any of these broad claims were awarded to Henderson, the priority of Henderson's use of the invention would be established and any remaining broad claims of the '223 patent would, in all probability, have been invalid over the Henderson prior art. Since Henderson was contending that he had used the invention in 1955 to make bows of the type claimed in the '240 patent, the '240 patent would, in all probability, also be invalid.

47. By decision rendered August 18, 1965, priority of invention as to claims 1, 2, 5 and 17 was in fact awarded to Henderson by the Patent Office Board of Interferences on the basis that Henderson had proven a reduction to practice of the invention of the '223 patent, including the manufacture of bows that are claimed in the '240 patent. 3M had previously been successful in obtaining dismissal of the interference against claims 14 and 15 on the basis of prior publications in a South African patent journal.

48. The August 18, 1965 decision of the Board of Patent Interferences was appealed by 3M to the United States Court of Customs and Patent Appeals which, in a decision dated July 14, 1966, affirmed the award of priority to Henderson on the two broadest claims at issue (claims 1 and 5 of the '223 patent) and remanded the case for further proceedings by the Patent Office Board of Interferences on the two more limited claims (claims 2 and 17 of the '223 patent). Kravig and Johnson v. Henderson, 362 F.2d 1015, 53 CCPA 1534 (1966).

49. The July 14, 1966 decision of the U.S. Court of Customs and Patent Appeals was supplemented by order dated February 6, 1967 to include in the remand an order to the Board of Interferences to consider Kravig and Johnson's allegations contained in their "Motion to Recall Mandate and Vacate Judgment for Fraud."

50. In review of the Board of Interferences' decision on its remand orders, the Court of Customs and Patent Appeals, on May 16, 1968, reversed the prior decision of the Patent Office Board of Interferences and awarded priority to Kravig and Johnson. Kravig and Johnson v. Henderson, 393 F.2d 1017, 55 CCPA 1182 (1968). Rehearing was denied on July 3, 1968.

51. On May 29, 1965, after the evidence on priority had been taken in the patent interference proceedings, the *Aranac* infringement suit was filed as noted in Finding of Fact # 42. In that action, infringement was charged of both the '223 patent and the '240 patent involved in the instant proceeding.

52. After the Court of Customs and Patent Appeals' May 16, 1968 decision awarding priority of invention to Kravig and Johnson in Interference No. 92–874 became final, the *Aranac* suit was moved forward, and on August 14,

1970, following discovery and in consideration of 3M's Motion for Preliminary Injunction, a consent decree was entered against David J. Henderson and Aranac Ribbon Mills. The consent decree admitted validity and infringement of claims 1, 2, 5, 14, 15 and 17 of 3M's '223 patent and claims 1, 2, 4 and 5 of 3M's '240 patent.

53. Doherty, Berwick's President never learned of the *Aranac* suit until sometime in late 1970 or early 1971, after the consent decree was entered.

54. The evidence of Henderson's fraud which ultimately resulted in a reversal and an award of priority to Kravig and Johnson in Interference No. 92,874 was obtained through discovery in the *Aranac* suit in late 1966, and was recognized by the Court of Customs and Patent Appeals in its supplemental order dated February 6, 1967.

55. From the declaration of the Henderson Interference on July 5, 1962, to the May 16, 1968 recall of the CCPA's mandate awarding priority to Henderson, 3M felt that it was not in a viable position to initiate any action against third parties for infringement of the '223 and '240 patents. In view of possible charges of bad faith, coercion and intimidation, and the liability which might have resulted, 3M felt that it would have been inadvisable to give notices of possible infringement to potential infringers during this period.

56. From May 29, 1965 to August 14, 1970, the validity and enforceability of the '223 and '240 patents, on grounds other than those involved in the Henderson Interference, were under attack in the *Aranac* suit. It was not until the entry of the Consent Judgment on August 14, 1970 that these issues were resolved in 3M's favor.

57. Throughout the years during which the Henderson Interference proceedings were pending and in progress, 3M granted numerous licenses with respect to its '223 and '240 patents. Each license agreement was prepared by 3M's patent counsel and uniformly recited that 3M "is the owner of the entire right, title, and interest in, to, and under Kravig and Johnson United States Letters Patent No. 2,933,223, granted to it on April 19, 1960, for an invention in method and machine for fabricating decorative bows, and Kravig and Johnson United States Letters Patent No. 3,112,240 granted to it on November 26, 1963, for Decorative Bows," and collected royalties in excess of $400,000. These licenses were granted only to those companies which requested them.

58. On June 15, 1967, before the Henderson proceedings had been finally concluded, in a letter over the signature of A. H. Redpath, a 3M executive, sent to Ragen Precision Industries, Inc., the manufacturer of the Ragen machines used by Berwick, 3M advised said company "of the existence of the two patents owned by our company" identifying the patents here involved and relating to "decorative bows", copies of which were enclosed. Failing to receive a response, Mr. Redpath, on July 25, 1967, again wrote to the Ragen Company, enclosing a copy of its previous letter and further advising the Ragen Company that:

"A number of licenses have been granted under these patents to companies which manufacture and sell bows covered under Patent No. 3,112,240 on equipment and methods covered under Patent No. 2,933,223."

The Ragen Company was further advised in said communication that "3M company does not itself make or sell automatic machines for making star bows" and inquired whether the Ragen Company would be interested in manufacturing bow producing equipment under an arrangement whereby it "would not be paying royalties to 3M." Ragen declined to accept the offer on the ground that such an arrangement would not help its business.

59. In the period from the issuance of the '223 patent on April, 1960 to the declaration of the Henderson Interference on July 5, 1962, there were two categories of potential users of the Kra-

vig and Johnson invention, i. e., manufacturers of bow machines and smaller companies who used machines of others to produce bows. Although in this early stage in the life of the patent 3M had not formulated any licensing policy with respect thereto, the evidence does reflect 3M's consideration of licensing machine manufacturers such as C.P.S. at that time. No such consideration was given to any of the smaller bow producers, such as Berwick. Two factors motivated 3M's reticence in this direction. First, since 3M was in the business of supplying industrial quantities of ribbon, it wanted to encourage the development of the bow industry and increase the sale of its ribbon. Second, consideration had to be given to the fact that customers who were buying 3M ribbon avowedly in order to make bows might claim that they had an implied license under the patent to use such ribbon for the purpose intended. To avoid this later problem, 3M, in the mid-1960's, began placing on all industrial 3M ribbon which might be used for bowmaking a notice which explicitly negated any implied license under the patent to use the ribbon for such purpose.

60. 3M's licensing policy, under the '223 and '240 patents, as finally formulated, was geared to obtaining royalties on the production of the decorative bows that were marketed and flowed out into commerce as opposed to royalties upon the manufacture and sale of bow producing machines. Therefore, machine manufacturers such as Ragen were either not sued for infringement or were given royalty free licenses.

61. Under this policy, 3M expected to obtain the maximum royalties from its patents while insuring that the machine manufacturers who were vital to the bow industry stayed in business.

## II. Discussion.

■ In order to sustain its defense of laches, Berwick has the burden of proving that there was an unexcused delay by 3M in asserting its known rights against Berwick, and that Berwick was prejudiced as a result. Jenn-Air Corporation v. Penn Ventilator Co., 464 F.2d 48 (3d Cir. 1972). Berwick points to more than ten years of delay between observance by Arnold Johnson, 3M's co-patentee, of the Augsburger bow machine in Berwick's plant in January, 1961, and 3M's offer to Berwick of a license under the '223 and '240 patents in June, 1971. Although suit was not instituted until 1973, Berwick concedes that this additional period beyond June, 1971, should not be counted towards the length of the delay since the parties were engaged in licensing negotiations during this time.

The elements of the defense of laches presupposes that Berwick was engaged in arguably infringing activity at the commencement of the alleged period of delay, and that 3M was aware of the infringing activity. The Court has found that Berwick's production of bows on the Augsburger machine in 1961 represented an infringement of the '223 patent and the '240 patent, later issued, as interpreted by 3M (Findings of Fact #'s 25 and 26). The Court has also found that 3M had notice of this infringing activity (Finding of Fact #29). 3M does not charge the Augsburger machine with infringement in this suit, and contests these findings of the Court. I feel that a brief explanation of these factual conclusions is warranted.

The Augsburger was a semi-automatic machine which produced star bows either identical or almost identical to bows which allegedly infringe 3M's '240 patent. The broad language of the '223 machine and method patent claims (Finding of Fact #7) have been liberally interpreted by 3M. The '223 patent, which was originally represented by 3M's small hand-powered machine, the S–71, is being asserted in this suit against such sophisticated machines as the Ragen Bowmatic. It would appear that 3M's interpretation of the '223 patent would include any machine which produced a decorative bow similar to those covered by the '240 patent. Ar-

nold Johnson's report on Berwick's Augsburger machine points to similar principles utilized by that machine and 3M's machines. In 1961, 3M recognized that Chicago Printed String Co., another bow producer, was using "an Augsburger machine or equal." (Finding of Fact #22). An infringement suit against Chicago Printed String Co. was subsequently prepared by 3M but never brought because of the Henderson interference proceedings (Finding of Fact #24). Finally, it should be noted that upon questioning by the Court at trial, 3M's attorney stated that "we have not charged [the Augsburger] with infringement, but I think I should say we could have." (Transcript, Vol. II, p. 43). Later in the trial 3M's position on this point was qualified by the following statement of counsel:

"I think perhaps I should say the question came upon, Your Honor, having asked me if the Augsburger machine infringed. Now while Mr. Johnson saw it, Mr. Delahunt didn't. I don't know whether that specific one infringed or not.

"If it is like the Augsburger machine that we later saw, and as to which we do have definite knowledge, if it was within, it infringed. But— well, it would be covered by the patent if it's like the later ones we saw. Well that is the situation. We can't recover it.

"Now if we assume it is the same, why then the answer is it infringed."

(Transcript, Vol. III, pp. 52–53). While there was evidence that the later Augsburgers to which counsel was referring had undergone some modifications, it is doubtful that the modifications were so extensive as to render the later models infringers, but not the earlier ones such as Berwick's. The evidence convinces the Court that Berwick's Augsburger infringed the '223 patent as interpreted by 3M. 3M does not contest the finding that the bows produced by Berwick infringed the later issued '240 patent as interpreted by 3M.

The evidence also compels the finding that 3M was aware of Berwick's infringing activity in early 1961. On three occasions, 3M personnel observed the Augsburger machine producing bows at the Berwick Plant. Following one of these occasions, Arnold Johnson, a 3M engineer and co-patentee of the '223 and '240 patents, issued a detailed report of the Augsburger operation which was circulated to A. H. Redpath, then General Manager of 3M's Gift Wrap and Fabric Division and later Division Vice President, among others. Mr. Redpath was the 3M employee most active in riding shotgun over the '223 and '240 patents. It is difficult to conceive of a means more likely to bring Berwick's infringing activity to the attention of 3M management than to have the co-patentee of the patents involved observe and report upon the operation of the infringing machine. Even if, as 3M contends, 3M management was not in fact aware of the infringing activity, then it should have been. As stated by the Supreme Court in Johnston v. Standard Mining Company, 148 U.S. 360, 370, 13 S.Ct. 585, 589, 37 L.Ed. 480 (1893):

". . . where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."

This principle is applicable to patent infringement cases in which the laches issue is raised. See Hamilton v. Mid-West Abrasive Company, 216 F.Supp. 411 (W.D.Pa.1963). Following the termination of contract between 3M and Berwick in late 1962, there was no reason for 3M to have assumed that Berwick had ceased bow production. Indeed, beginning in 1966, Berwick increased its production to the extent that millions of bags of bows designating Berwick as the manufacturer appeared in retail stores throughout the country. In my view, 3M is also chargeable with this noticeable increase in Berwick's bow

production. From January, 1961, until June 25, 1971, except for the notice contained on the 5–73 bow machine delivered to Berwick which bore the '223 patent number, 3M never notified Berwick of the existence of the patents in question or of 3M's intention to assert its patent rights. An unexcused delay of this duration, accompanied by resultant prejudice to Berwick, would justify a finding that 3M is barred by laches. See West-co-Chippewa Pump Co. v. Delaware Electric & Supply Co., 64 F.2d 185 (3d Cir. 1933). However, 3M contends that its involvement in the Henderson interference action and the *Aranac* infringement suit from 1962 until 1970 excused its inaction as to Berwick. (Finding of Fact #42). At the risk of repetition, the Court feels that the following chronology of events would be helpful in considering the laches question:

| | |
|---|---|
| July 23, 1958 | 3M files application for the '223 and '240 patents |
| April 19, 1960 | '223 patent in suit issued to 3M |
| May 19, 1960 | 3M notifies Chicago Printed String Co. of the '223 patent, and invites licensing negotiations |
| November 18, 1960 | Berwick acquires Augsburger bow machine and begins bow production |
| January 11–13, 1961 | Arnold Johnson visits Berwick plant and notes use of Augsburger machine |
| January 16, 1961 | Johnson circulates to 3M personnel report containing detailed analysis of Augsburger machine |
| April 27, 1961 | Berwick orders S–73 automatic bow machine from 3M |
| August 17, 1961 | 3M ribbon salesman, Keegan, and 3M field engineer, Nelson, install S–73 bow machine at Berwick plant and observe Augsburger |
| December 7–8, 1961 | Johnson and Keegan visit Berwick plant to repair and assist in operation of the S–73, and note Berwick's difficulties with the Augsburger machine |
| June 27, 1962 | Berwick acquires and begins to use second Augsburger and continues use of first Augsburger |
| July 5, 1962 | Declaration of Interference 92,874 between Kravig and Johnson's '223 patent and an application of Henderson |
| November 2, 1962 | Berwick advises 3M that joint bow sales program has not worked out, and seeks to return S–73. |
| December 10, 1962 | Berwick returns S–73 |
| November 26, 1963 | '240 patent in suit issued to 3M on application maturing from the original application. |
| May 29, 1965 | Suit filed by 3M for infringement of '223 and '240 patents against Henderson and his company, Aranac Ribbon Mills, in Northern District of New York |

| | |
|---|---|
| August 18, 1965 | First decision of the Board of Patent Interference in Interference 92,874 awarding priority to Henderson on primary claims of '223 patent |
| July 14, 1966 | First decision of the U. S. Court of Customs and Patent Appeals (CCPA) affirming the award of priority to Henderson on two claims of '223 patent, and remanding for further proceedings with respect to remaining claims. |
| 1966–1971 | Berwick begins to expand bow business, acquiring eight Tye-Sil machines in 1966; seven Ragen Bowmatics in 1967; four Ragens in 1968; seven Ragens and a Cambarloc in 1969; one Ragen and three Tye-Sils in 1970; two Ragens in 1971; millions of bags containing 25 bows each and designated as being manufactured by Berwick appear in retail stores throughout the country |
| February 6, 1967 | Order of CCPA granting 3M's Motion to recall Mandate and Vacate Judgment for Fraud, and remanding to Board of Patent Interference for consideration of new evidence |
| March 10, 1967 | Decision of Board of Patent Interference that new evidence of fraud by Henderson was insufficient to support any action by the Board |
| June 15, 1967 | 3M notifies Ragen Precision Industries, Inc., manufacturer of the Ragen Bowmatic, of existence of '223 and '240 patents, and offers royalty-free license |
| May 16, 1968 | Second decision by CCPA reversing prior award of priority to Henderson and awarding priority to 3M on all claims of '223 patent |
| August 14, 1970 | 3M obtains consent judgment in *Aranac* infringement suit |
| June 25, 1971 | 3M advises Berwick of outcome of *Aranac* suit and offers to discuss license under '223 and '240 patents |
| October, 1972 | Berwick and William E. Wright Co. make agreement to resist 3M's threats and to assist each other in any infringement suit by 3M |
| February 23, 1973 | Instant suit filed |

■ It is a general principle of patent law that a patentee is excused from bringing an action against an alleged infringer during the pendency of another infringement action on the same patent. See Jenn-Air Corporation v. Penn Ventilator Co., 464 F.2d 48 (3d Cir. 1972); Armstrong v. Motorola, Inc., 374 F.2d 764 (7th Cir., cert. denied 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967)); Clair v. Kastar, Inc., 148 F.2d 644 (2d Cir. 1945); Montgomery Ward & Co. v. Clair, 123 F.2d 878 (8th Cir. 1941). But see American Home Products Corp. v. Lockwood Manufacturing Co., 483 F.2d 1120 (6th Cir. 1973), cert. denied 414 U.S. 458, 94 S.Ct. 917, 39 L. Ed.2d 110. In my view, this principle extends to an interference proceeding where the priority of the patent is in issue.

■ This Court is bound by the Third Circuit's opinion in Jenn-Air Corporation v. Penn Ventilator Co., *supra,* and a review of the facts and holding in that case is in order.[1] A patent on plaintiff's power ventilator was issued in 1951. Plaintiff had been manufacturing the ventilator since 1947. In 1957, the defendant began manufacturing a power ventilator which the District Court later found infringed plaintiff's patent. On May 2, 1958, plaintiff's attorney notified defendant that it should cease manufacturing the ventilator because it infringed plaintiff's patent. Receiving no response, another letter was sent to defendant on June 25, 1958, warning that manufacturing of the ventilator must cease or plaintiff would "take further steps to protect its patent rights." On July 7, 1958, defendant denied that it was infringing plaintiff's patent. An August 1, 1958 letter from plaintiff to defendant requesting the basis of defendant's interpretation of the patent went unanswered. No further action was taken by plaintiff until December 6, 1967 when it applied to

bring the patent into then pending litigation against defendant charging infringement of other patents of plaintiff. Thus, at least 9 years elapsed between the time plaintiff became aware of the infringing activity and the assertion of its rights. In the meantime, from November, 1963 until April 18, 1966, plaintiff was establishing the validity of the patent in question in a suit against another infringer. The only prejudice as a result of this delay which defendant attempted to prove was that it continued to produce the accused device during the nine-year period of delay.

On these facts, the District Court held that plaintiff was barred by laches from asserting its claim against defendant. On appeal, the Third Circuit reversed upon two grounds. First, the Court held that defendant's continuing production of the infringing product was not such prejudice as would sustain a claim of laches. Second, and more important in considering the case at bar, the Court held that plaintiff was excused from suing defendant during the pendency of the other infringement action on the same patent. "Under these facts, it is sound law as plaintiff urges that it is not necessarily bound to take on more than one infringer at a time." 464 F.2d at 50.

Berwick urges this Court to follow the later case of American Home Products Corp. v. Lockwood Manufacturing Co., *supra,* in which the Sixth Circuit, on facts very similar to those in Jenn-Air, held that Plaintiff was barred by laches because during the pendency of the other patent litigation it did not reaffirm its earlier position that defendant was infringing the patent and inform defendant that it intended to file suit following the termination of the other litigation. I find *Jenn-Air* and *American Home Products* irreconcilable. As such, the Third Circuit opinion in *Jenn-Air* is,

---

1. The Third Circuit Opinion is somewhat sparse in its recitation of the facts. Where necessary, the Court has utilized the facts found by the District Court in an unreported opinion, Jenn-Air Corporation v. Penn Ventilator Co., Inc., Civil Action No. 3890 (E.D.Pa., filed March 5, 1970).

of course, controlling on the common issues present in the two cases.

Nevertheless, in considering the question of laches in a patent infringement action, "[n]o case is an exact precedent for another because the facts in no two cases are exactly alike . . . ." Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., 64 F.2d 185 (3d. Cir. 1933). There is an important difference between the factual situation in *Jenn-Air* and in the case at bar. In *Jenn-Air* plaintiff notified defendant of the existence of the patent soon after defendant began manufacturing the infringing product, and stressed its intention to enforce its rights under the patent. In the present case, at no time prior to the June 25, 1971 letter to Berwick did 3M inform Berwick of the existence of the '223 and '240 patents. While the District Court in *Jenn-Air* found it unnecessary to determine whether Defendant's infringement of Plaintiff's patent was willful, the Third Circuit characterized it as flagrant. 464 F.2d at 49. Here, Berwick was not even aware of 3M's patents. (Finding of Fact #35). Additionally, we are faced in this case with the fact that for almost two years in the early 1960's, 3M was actively helping Berwick develop its bow producing business, albeit for the purpose of encouraging the use of 3M products.

Berwick does not contend that 3M should have filed this action any earlier than it did on February 23, 1973. Jenn-Air negates the necessity of doing so. However, Berwick contends that 3M at least had the duty of informing Berwick of the existence of the patents, a fact which, if known, may have greatly influenced Berwick's decisions regarding the future course of its decorative bow business. I find nothing in Jenn-Air which would sanction 3M's ten-year delay in taking any action whatsoever to assert its patent rights to a known in-

fringer. In those cases applying the "other litigation" principle as an excuse for delay in bringing an infringement action, the plaintiff had either given defendant prior notice of the patents, Armstrong v. Motorola, Inc., *supra*, or the defendant was actually aware of the other litigation involving the patent. Clair v. Kastar, Inc.,[2] *supra*; Montgomery Ward & Co. v. Clair, *supra*. I have found that Berwick had no knowledge of 3M's other patent litigation until late 1970 or early 1971. (Finding of Fact #53). The instant case is most similar to Anchor Stove and Range Co. v. Montgomery Ward & Co., 114 F.2d 893 (7th Cir. 1940), in which other patent litigation was held not to excuse Plaintiff's long delay where there was apparently no prior notice of the patents to defendant and where defendant may have been unaware of the other litigation.

The Henderson interference proceeding and the *Aranac* suit did not excuse 3M from at least notifying Berwick of the existence of the patents. Indeed, from January, 1961, until July, 1962, there were no proceedings involving the '223 patent, and 3M could have easily sent Berwick a letter similar to the one sent to Chicago Printed String Co. in May, 1960 (Finding of Fact #23). 3M contends that once the Henderson interference was declared in July, 1962, 3M's right to the '223 and '240 patents was placed in grave doubt, and cites Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) for the proposition that any unwarranted attempt to enforce its patent rights may have constituted an antitrust violation. *Walker Process* held that one who obtains a patent by fraud and thereafter uses the patent to exclude others from the market through threats of and prosecutions of infringement suits may violate § 2 of the Sherman Act provided all

---

2. The Second Circuit opinion in this case did not address this question. But the District Court opinion, 58 F.Supp. 378, 380 (S.D.N.Y.1944), stated that the facts on the laches issue were the same as those presented in Montgomery Ward & Co. v. Clair, *supra*, a case involving the same patent. In Montgomery Ward, the Court indicated that defendant was aware of the prior litigation, 123 F.2d at 883.

other elements of a § 2 monopolization charge are proved. Any liability to 3M under the *Walker Process* rationale could have been avoided with a properly worded notice to Berwick. 3M need not have threatened Berwick with an immediate infringement action. It could have, for example, informed Berwick of the existence of the patents, the facts surrounding the pending Henderson interference, and 3M's belief that it would prevail and that the priority of the '223 patent would be proved. It should be noted that during the pendency of the Henderson interference, 3M was granting to other businesses licenses in which it was declared that 3M was the "owner of the entire right, title, and interest in, to, and under" the '223 and '240 patents. (Finding of Fact #57). Even if, out of an abundance of caution, 3M were justified in not sending notices of its patents to possible infringers during the Henderson Interference, the reason for such caution practically vanished when the Henderson's fraud was discovered and the Court of Customs and Patent Appeals remanded the case to the Board of Patent Interferences on February 6, 1967. 3M must have been confident of success at this time since on June 15, 1967, it informed Ragen Precision Industries, Inc., of the patents and offered a gratuitous license. A similar notice to Berwick at this time would have been equally appropriate.

■■■ 3M argues that Berwick had notice of the '223 patent by virtue of the patent number on 3M's S–73 machine which was in Berwick's plant from August, 1961 until December, 1962 (Findings of Fact #'s 31 and 32.) It is further contended that armed with the '223 patent number, Berwick could have obtained a copy of the patent from the Patent Office and consulted with patent counsel as to the implications of the patent on Berwick's business. It is unlikely that anyone at Berwick ever noticed the patent notice on the S–73. (Finding of Fact #33). Even if they had, it is doubtful that the ordinary businessman should be required to ascertain the im-

plication of every patent notice he observes. Assuming for the sake of argument that Berwick was saddled with such a responsibility and that the '223 patent was actually obtained from the Patent Office, this does not render 3M's lack of notice harmless. Berwick was entitled to some form of positive statement from 3M that the patent was considered to be a valid one and that 3M intended to assert its rights under that patent at some time in the future.

■■■ I find that 3M unreasonably and inexcusably delayed asserting its rights under the '223 and '240 patents by not notifying Berwick of the patents from January, 1961, until June 25, 1971. The question remains whether Berwick was prejudiced by this delay. An expansion of an infringer's business is the kind of prejudice which will support the defense of laches. Continental Coatings Corporation v. Metco, Inc., 464 F.2d 1375 (7th Cir. 1972). Here, Plaintiff has invested over a quarter of a million dollars in new machinery, the only function of which is to produce decorative bows of the type in issue. (Finding of Fact #17). In addition, Berwick has greatly expanded its plant capacity and the number of workers it employs, and has even added a plant on the West Coast which produces bows. The decorative bow business has become so important to Berwick that it now represents about one-fourth of Berwick's annual business. An injunction against future production of bows, or a large damage award for past infringements, would seriously affect Berwick's competitive standing. (Finding of Fact #17). As stated by the Third Circuit in Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., *supra*:

"[Defendant] now has a new factory with new equipment worth a quarter million dollars, not including its good will. An injunction against the defendant would virtually destroy this entire investment made in consequence of plaintiff's long delay in asserting its rights.

"We think that the evidence clearly shows the delay, during which defendant materially changed its position, to be inexcusable."

64 F.2d at 188.

Berwick has sustained its burden of proving 3M's inexcusable delay and prejudice to Berwick, and consequently must prevail on the issue of laches.

I turn now to the equitable estoppel defense raised by Berwick. 3M contends that there is a critical distinction between laches and estoppel—by reason of laches, 3M may have lost the right to recover for past infringement, but its right to equitable relief or to damages for future infringement should survive absent an estoppel. Berwick contends that the doctrine of laches and estoppel are essentially the same, and that its proof of inexcusable delay and prejudice to Berwick should bar all forms of rleief.

██ Were this an issue of first impression, I would agree with Berwick that it would be inequitable to grant 3M any relief in light of the ten-year delay without notice of the patents coupled with the substantial increase in Berwick's bow business. However, this is not the law. In a trademark case, the Supreme Court established a clear distinction between laches and estoppel. Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888):

"Delay in bringing suit there was, and such delay as to preclude recovery of damages for prior infringement; but there was neither conduct nor negligence which could be held to destroy the right to prevention of further injury." 128 U.S. at 524, 9 S.Ct. at 145.

Relying on *Menendez*, later courts have applied the distinction to patent infringement actions. See, e.g., Continental Coatings Corporation v. Metco, Inc., 464 F.2d 1375 (7th Cir. 1972); Royal-McBee Corporation v. Smith-Corona Marchant, Inc., 295 F.2d 1 (2d Cir. 1961); George J. Meyer Mfg. Co. v. Miller Mfg. Co., 24 F.2d 505 (7th Cir. 1928). A review of the cases reveals that a defense of estoppel is made out only where the following elements are proven: (1) infringement; (2) knowledge by the patent owner of the infringement; (3) conduct of the patent owner which misleads the infringer into believing that the patent owner has abandoned his patent or acquiesced in the infringement; and (4) reliance by the infringer on such conduct. Thus, it was noted by the Court in Continental Coatings Corporation v. Metco, Inc., *supra*:

" . . . this circuit has consistently denied the patentee any relief if the evidence of unreasonable and unexcused delay also disclosed that the patentee's conduct had encouraged the belief that the infringer's business would be unmolested. In each such case the infringement notice was either withdrawn or followed by such a long period of inactivity as to justify an inference of abandonment."

464 F.2d at 1380. Cases in the Third Circuit which have applied the estoppel doctrine have also relied on the patentee's notice to the infringer of his patent rights followed either by a withdrawal or a long delay by the patentee. See Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co., *supra*. See also, Anheuser-Busch, Inc. v. DuBois Brewing Co., 175 F.2d 370 (3d Cir. 1949) (common law trade name case).

██ In the case at bar, 3M never notified Berwick of the patents or charged Berwick with infringement. There was no conduct on the part of 3M which could have misled Berwick into believing that 3M had abandoned its patents or acquiesced in their use. Indeed, the Court has found that Berwick was never aware of the '223 and '240 patents. In light of this unawareness, 3M's 1961–62 involvement in Berwick's business could not have led to an inference that Berwick's alleged infringement would go unchallenged. In increasing its bow business, Berwick may have relied in part on the absence of any patent infringement claims by anyone. How-

ever, the most important factor which led Berwick to increase production was the new market for decorative bows. Under these circumstances, while proving its defense of laches, Berwick has not sustained its burden on the estoppel issue by demonstrating misleading conduct by 3M and Berwick's reliance thereon. See Hughes Aircraft Co. v. General Instrument Corp., 275 F.Supp. 961 (D.R.I.1967).

This does not mean that the Court is compelled to prohibit only damages for infringement prior to the filing of this suit, and to allow all other damages or injunctive relief, or both. The Court retains its power to do equity under all the circumstances. 3M is not an innocent party. As noted in the earlier portions of this Opinion, Berwick may not have so materially altered its position had 3M at least notified Berwick of the patents. Should this case ultimately result in a finding that one or both of the patents are valid and infringed, a flexible approach to the question of appropriate relief would be considered. See Royal-McBee Corporation v. Smith-Corona Marchant, Inc., *supra*, where the District Court, in balancing the equities, denied injunctive relief upon the payment of a fair royalty for continued use of the device during the relatively short period remaining of the life of the patent. The Court will determine this matter following a trial of the case on the merits.

 Berwick's other contentions, that 3M's licensing policy was illegal and that Berwick had an implied license under the patents, are without merit. 3M's cause of action against manufacturers of machines infringing the '223 patent is wholly separate and distinct from the cause of action against those who use the infringing machines to produce bows infringing the '240 patent. See Triangle Conduit & Cable Co. v. National Elec. Products Co., 125 F.2d 1008 (3d Cir. 1942). While an implied license does not require a formal agreement, there must be conduct on the part of the patentee from which the infringer

may properly infer that the patentee consents to the use of the patent. DeForest Radio Tel. & Tel. Co. v. United States, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927). Berwick could have drawn no such inference since it was unaware of 3M's patents.

Berwick's defense of laches is sustained and that part of 3M's complaint requesting past damages will be dismissed. Berwick's defense of estoppel is denied. The case will be set for trial to consider the merits of the infringement claims and Berwick's counterclaims, and the question of appropriate relief, if necessary. An order in conformance with this Opinion will be entered.